This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-37978**

**HALLIBURTON ENERGY SERVICES, INC.,**

Protestant-Appellant,

v.

**NEW MEXICO TAXATION & REVENUE DEPARTMENT,**

Respondent-Appellee,

**IN THE MATTER OF THE PROTEST OF THE DENIAL OF REFUND ISSUED UNDER LETTER ID NOS. L0037204528, L0708364848, and L1630542128.**

**APPEAL FROM THE ADMINISTRATIVE HEARINGS OFFICE**
**Brian VanDenzen, Chief Hearing Officer**

Miller & Chevalier Chartered
Adam P. Feinberg
Washington, DC

Sutin, Thayer & Browne
Suzanne Wood Bruckner
Andrew J. Simons
Wade L. Jackson
Albuquerque, NM

for Appellant

Peifer, Hanson, Mullins & Baker, P.A.
Mark T. Baker
Matthew E. Jackson
Albuquerque, NM

David Mittle, Special Assistant Attorney General

Santa Fe, NM

for Appellee

**MEMORANDUM OPINION**

**BOGARDUS, Judge.**

**{1}** Haliburton Energy Services, Inc. (Taxpayer) appeals from a decision and order of the chief administrative hearing officer (AHO) upholding the New Mexico Taxation and Revenue Department's (the Department) assessment of gross receipts taxes under the Gross Receipts and Compensating Tax Act (the Act), NMSA 1978, §§ 7-9-1 to -119 (1966, as amended through 2021), on a portion of receipts from sales related to hydraulic fracturing (fracking) of oil wells in the Permian Basin. Taxpayer argues (1) the AHO erred in determining that it was not entitled to a deduction for the sale of chemicals pursuant to Section 7-9-65 (1969);[1] (2) the AHO's interpretation of the word "lots" in Section 7-9-65 was improper; and (3) the AHO erred in determining curable resin coated (CRC) proppant is not a chemical. We affirm.

**BACKGROUND**

**Procedural Facts**

**{2}** Between December 2015 and December 2017, Taxpayer filed three claims for gross receipts tax refunds with the Department totaling approximately 84 million dollars[2] for tax periods between December 1, 2011 and April 30, 2015; March 1, 2012 and December 31, 2014; and December 1, 2012 and October 31, 2014. The Department denied each refund, and Taxpayer protested the denials. The parties agreed to consolidate the protests and bifurcate addressing the issues into two hearings. At the first hearing, the AHO was presented with three issues: (1) for products, other than proppants, for which Taxpayer sought a refund, whether Taxpayer sold the products or used the products during the performance of a service; (2) for the purposes of the deduction under Section 7-9-65, how is a "lot" measured; and (3) whether CRC proppant is a chemical for purposes of Section 7-9-65. The AHO's decision and order at this hearing was dispositive, so a second hearing was not necessary.

**Overview of Fracking**

**{3}** Fracking is a method used in the oil and gas industry to create fractures in oil or gas bearing formations to maximize oil production. Oil and natural gas is contained within rock formations thousands of feet below ground. The purpose of fracking is to

---

1Unless otherwise noted, all references to Section 7-9-65 in this opinion are to the 1969 version of the statute.

2We note that Taxpayer has performed fracking for decades, during which the deduction under Section 7-9-65 was available, but did not previously seek the deduction. A deduction for selling chemicals in excess of eighteen-ton lots has been available since 1965. NMSA 1953, § 72-17-4(J) (1965).

crack rock to connect the underground rock formations and release trapped oil and gas. During the fracking process, Taxpayer pumps fluid into their customers' well sites to create fractures. Taxpayer then pumps proppant or a proppant agent, a type of sand that lodges into cracks to keep the fractures from closing, into the well, allowing the oil and gas to flow. The fluids that are pumped into the ground include acid and fluid systems, which are comprised of various chemicals and compounds, such as a gelling agent, a cross-linker, a breaker for the gel, a buffering agent, and water. During the process, Taxpayer crew members mix the components, then pump the mixtures at varying pressures into their customer's wells.

## DISCUSSION

**{4}**     Taxpayer makes three general arguments on appeal. It first argues the AHO erred as a matter of law in the determination that it was not entitled to a deduction for the sale of chemicals used in the fracking process pursuant to Section 7-9-65. It next argues the AHO's interpretation of the word "lots" per Section 7-9-65 was legal error. Finally, it argues the AHO erred in determining CRC proppant is not a chemical.

### Standard of Review and Presumptions

**{5}**     A taxpayer may appeal a decision and order of the AHO for further relief, but we may set aside the decision and order only if it is "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with the law." NMSA 1978, § 7-1-25(C) (2015); *Stockton v. N.M. Tax'n & Revenue Dep't*, 2007-NMCA-071, ¶ 8, 141 N.M. 860, 161 P.3d 905.

**{6}**     The parties to this case do not dispute the AHO's findings of fact, but rather focus their arguments on the meaning of the statutes in the Act and related regulations that guided the AHO's conclusions of law. Because we must interpret the statutes and regulations in effect at the time, we adhere to a de novo standard in our review. *Quantum Corp. v. N.M. Tax'n & Revenue Dep't*, 1998-NMCA-050, ¶ 8, 125 N.M. 49, 956 P.2d 848. Nonetheless, "in state taxation cases, although we apply the de novo standard, we consider the issues through the lens of a presumption that the [d]epartment's assessment is correct." *Corr. Corp. of Am. v. State*, 2007-NMCA-148, ¶ 17, 142 N.M. 779, 170 P.3d 1017; *see* NMSA 1978, § 7-1-17(C) (2007) ("Any assessment of taxes or demand for payment made by the department is presumed to be correct.").

**{7}**     The Act imposes an excise tax equal to five and one-eighth percent of gross receipts upon any person engaging in business in New Mexico. Section 7-9-4(A). "The purpose of the gross receipts tax is that individuals should pay taxes for the privilege of engaging in business within New Mexico." *ITT Educ. Servs., Inc. v. N.M. Tax'n & Revenue Dep't*, 1998-NMCA-078, ¶ 5, 125 N.M. 244, 959 P.2d 969 (internal quotation marks and citation omitted). The Act establishes a presumption that all receipts are

taxable. Section 7-9-5(A) (2002).[3] When as here, we construe a statutory exception to a tax, we do so strictly in favor of the taxing authority. *Chavez v. Comm'r of Revenue*, 1970-NMCA-116, ¶ 7, 82 N.M. 97, 476 P.2d 67.

**{8}** Given these presumptions, "the party claiming entitlement to an exemption or deduction from the gross receipts tax bears the burden of clearly overcoming" the presumptions. *Pub. Serv. Co. of N.M. v. N.M. Tax'n & Revenue Dep't*, 2007-NMCA-050, ¶ 32, 141 N.M. 520, 157 P.3d 85. "The exemption must be clearly and unambiguously expressed in the statute, and must be clearly established by the taxpayer[.]" *Id.* (internal quotation marks and citation omitted).

**Applicable Rules of Statutory Construction**

**{9}** Generally, "[i]n construing the language of a statute, our goal and guiding principle is to give effect to the intent of the Legislature." *Lujan Grisham v. Romero*, 2021-NMSC-009, ¶ 23, 483 P.3d 545. "In determining legislative intent, [appellate courts] look to the plain language of the statute and the context in which it was enacted, taking into account its history and background." *Pirtle v. Legis. Council*, 2021-NMSC-026, ¶ 14, 492 P.3d 586. "[W]here the language of the legislative act is doubtful or an adherence to the literal use of words would lead to injustice, absurdity or contradiction, the statute will be construed according to its obvious spirit or reason, even though this requires the rejection of words or the substitution of others." *N.M. Real Estate Comm'n v. Barger*, 2012-NMCA-081, ¶ 7, 284 P.3d 1112 (internal quotation marks and citation omitted). Moreover, "[w]e consider all parts of the statute together, reading the statute in its entirety and construing each part in connection with every other part to produce a harmonious whole." *Dep't of Game & Fish v. Rawlings*, 2019-NMCA-018, ¶ 6, 436 P.3d 741 (alterations, internal quotation marks, and citation omitted).

**Taxpayer's Sales for Fracking Do Not Qualify for Section 7-9-65's Deduction**

**{10}** Taxpayer claims entitlement to the deduction found at Section 7-9-65, which allows for deduction of gross receipt taxes for

> [r]eceipts from selling chemicals or reagents to any mining, milling or oil company for use in processing ores or oil in a mill, smelter or refinery or in acidizing oil wells, and *receipts from selling chemicals or reagents in lots in excess of eighteen tons*[.] . . . Receipts from selling explosives, blasting powder or dynamite may not be deducted from gross receipts.

(Emphasis added.) The parties stipulated to the AHO that the question of whether "for products, other than proppants, for which Taxpayer seeks a refund, did Taxpayer sell the products or did the Taxpayer use those products during the performance of a service?" Reframing the parties' stipulation slightly, we see the question before us as whether receipts associated for the provision of fracking amount to a sale of chemicals

---

[3]Unless otherwise noted, all references to Section 7-9-5(A) in this opinion are to the 2002 version of the statute.

under the Act. Taxpayer argues that because fracking does not meet the definition of a service under the Act, *see* § 7-9-3(M) (2007), which statutorily codified the predominant ingredient test, the transactions at issue were predominantly sales of chemicals and thus subject to Section 7-9-65's deduction for receipts from selling chemicals or reagents in lots in excess of eighteen tons. Under the predominant ingredient test we look to the seller's relative investment of skills and materials to determine what constitutes the predominant ingredient of the transaction and accordingly determine whether a transaction is a sale of a service. *E G & G, Inc. v. Dir., Revenue Div. Tax'n & Revenue Dep't*, 1979-NMCA-139, ¶¶ 7-9, 94 N.M. 143, 607 P.2d 1161. Taxpayer contends that because its relative investment was predominately materials, i.e., chemicals, rather than labor, fracking is not a service, and thus Taxpayer is entitled to the deduction.

{11}    Taxpayer's contention that we should apply the predominant ingredient test to determine whether fracking is a service is grounded in principles of statutory construction. *See High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (noting general principles of statutory construction include (1) "the plain language of a statute is the primary indicator of legislative intent[,]" and we "give the words used in the statute their ordinary meaning unless the [L]egislature indicates a different intent"; and (2) when "several sections of a statute are involved, they must be read together so that all parts are given effect" (internal quotation marks and citations omitted)). However, Taxpayer overlooks that our primary task is to "seek to give effect to the Legislature's intent," *Valenzuela v. Snyder*, 2014-NMCA-061, ¶ 16, 326 P.3d 1120, and to do so, we must "exercise caution in relying on the plain language of a statute because its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *Taylor v. Waste Mgmt. of N.M.*, 2021-NMCA-026, ¶ 8, 489 P.3d 994 (internal quotation marks and citation omitted). Here, as we explain, multiple legislative actions indicate the Legislature did not intend the deduction to apply to the chemicals sold in conjunction with fracking.

{12}    We start by agreeing with the AHO's analysis of the chemicals deduction statute itself. The statute is separated into three clauses, with the first two being relevant to our analysis. Section 7-9-65; *see Valenzuela*, 2014-NMCA-061, ¶ 16 ("[W]e should read the entire statute as a whole so that each provision may be considered in relation to every other part." (internal quotation marks and citation omitted)). The first clause, "[r]eceipts from selling chemicals or reagents to any mining, milling or oil company for use in processing ores or oil in a mill, smelter or refinery or in acidizing oil wells," modifies the terms "chemicals or reagents" with the verbs to use, to process, and to acidize, all of which indicate performance of a service. The second clause contains no such modification. By modifying "chemicals" by use in the first clause, and omitting this modification in the second, the Legislature distinguished between chemicals intended to be used in the performance of certain services and chemicals in lots greater than eighteen tons. Thus, as the AHO concluded, the deduction in the second clause for a sale of chemicals in greater than eighteen-ton lots applies to receipts from the sale of

chemicals themselves, rather than from the sale of chemicals used by Taxpayer in conjunction with fracking. The Department succinctly describes the two as the use-driven clause and the weight-driven clause.

**{13}** Taxpayer makes two arguments challenging the AHO's construction of the statute. The first is that the modifying verbs apply to the uses to which the buyer will put the chemicals or reagents after the sale, not the seller, i.e., the taxpayer. It argues that because both clauses require a sale of chemicals or reagents from the seller, i.e., the taxpayer, the seller is not limited to selling the chemicals or reagents in a standalone manner in order to receive the deduction. Although the verbs at issue modify the actions of a *user*, rather than a *buyer*, that does not change our analysis. The language in this clause is focused on how the chemicals are used, not whether the seller or buyer is the user. The deduction applies if the chemicals sold are being used in a specific way—to process or to acidize—*or* if the chemicals sold exceed a certain size—here, eighteen-ton lots.

**{14}** Taxpayer also argues the AHO's interpretation erroneously adds a requirement to the statute that is not in the statute's plain language. It argues that the Legislature's failure to include the verbs from the first clause in the second clause should be presumed to be intentional. *See State v. Jade G.*, 2007-NMSC-010, ¶ 28, 141 N.M. 284, 154 P.3d 659 ("[W]hen the Legislature includes a particular word in one portion of a statute and omits it from another portion of that statute, such omission is presumed to be intentional."). Thus, Taxpayer contends the sale of chemicals need not be a standalone sale; rather the second clause includes the sale of chemicals used in a service, if those chemicals meet the weight requirement.

**{15}** We disagree. To interpret that omission as Taxpayer requests is inconsistent with our directive to presume all receipts are taxable and construe deductions narrowly and strictly in favor of the Department. *See* § 7-9-5(A) (establishing a presumption under the Act that all receipts are taxable); *TPL, Inc. v. N.M. Tax'n & Revenue Dep't*, 2003-NMSC-007, ¶ 9, 133 N.M. 447, 64 P.3d 474 (stating when we construe a statutory exception to a tax, we do so strictly in favor of the taxing authority). We conclude omission of a reference to "service" indicates that the Legislature intended the second clause of the deduction to apply only to standalone sales of chemicals or reagents, and not to sales of chemicals as part of a service. Our analysis of the applicability of the deduction for a standalone sale of chemicals in excess of eighteen-ton lots in this case is supported by the analysis found in *E G & G* construing a deduction that did include language referencing a service.

**{16}** In *E G & G*, this Court applied the predominant ingredient test to a taxpayer's claim for deduction under NMSA 1978, Section 7-9-54 (1976)[4] for sale of tangible personal property. *E G & G*, 1979-NMCA-139, ¶¶ 1-2. The deduction read:

---

4Unless otherwise noted, all references to Section 7-9-54 in this opinion are to the 1976 version of the statute.

> Receipts from selling tangible personal property . . . to the United States or any agency or instrumentality thereof or the state of New Mexico or any political subdivision thereof may be deducted from gross receipts. . . . That portion of the receipts from performing a *service* as defined in Subsection K of Section 7-9-3 [(1976)] which reflects the value of tangible personal property utilized or produced in the performance of such *service* is not deductible.

*Id.* ¶ 2 (emphases added) (omissions in original) (quoting Section 7-9-54). In determining whether the deduction was applicable, we rejected the contention that the predominant ingredient test did not apply because the statute specifically referenced the sale of a service. *Id.* ¶ 10. Because the term "service" was at issue based on the text of the statute, application of the definition of a service and the predominant ingredient test were necessary. *Id.* ¶¶ 10, 12. Here, in contrast, the weight-driven clause of Section 7-9-65 refers only to the sale of chemicals or reagents in lots in excess of eighteen tons. Reference to a service is found only in the distinct use-driven clause. Thus, the omission of the reference to a service in the weight-driven clause indicates we need not apply the Act's definition—the predominant ingredient test—to determine if Taxpayer's sales are subject to the deduction. We need only determine if Taxpayer's sale is a standalone sale of chemicals.

**{17}** Looking next to the legislative history of the statute to determine whether Taxpayer is entitled to the deduction, we note that even if the statutory definition of a service was applicable, the legislative history of the chemicals deduction indicates the Legislature did not intend the predominant ingredient test to apply. When the chemicals deduction was enacted, the definition of a service was not governed by the predominant ingredient test, instead, the definition was based on the principal objectives of the parties. *See* § 7-9-3(K) (1969); *Evco v. Jones*, 1970-NMCA-076, ¶ 8, 81 N.M. 724, 472 P.2d 987 (explaining that the definition of a service at the time depended on the ultimate purpose of the contract). This suggests the Legislature did not intend for the predominant ingredient test to govern which transactions were subject to the chemicals deduction but intended that the transactions be evaluated by looking to the parties' principal objectives as shown by the ultimate purpose of the contract.

**{18}** Further, we agree with the AHO that to hold differently would lead to the deduction swallowing the presumption that all receipts are taxable. Section 7-9-5(A). Because the deduction applies to chemicals in lots in excess of eighteen tons, construing the deduction as Taxpayer does would result in treating virtually every fracking transaction in dispute as a sale of chemicals because the value of the chemicals sold would exceed any value of the service provided. We view the analysis in *Rauscher, Pierce, Refsnes, Inc. v. New Mexico Taxation & Revenue Department*, 2002-NMSC-013, ¶¶ 36-40, 132 N.M. 226, 46 P.3d 687, as instructive on this issue.

**{19}** In *Rauscher*, the taxpayer was a licensed broker-dealer of securities who bought mutual funds at a discount and then sold the securities. *Id.* ¶¶ 2-3. He was taxed on the difference between what he paid for the funds and what he sold them for as a

commission pursuant to Section 7-9-3(F)(1)(b) (1989). *Rauscher*, 2002-NMSC-013, ¶ 1. The taxpayer argued the sale of securities was subject to a deduction pursuant to Section 7-9-25 (1969), which provided, "[E]xempted from the gross receipts tax are receipts from the sale of stocks, bonds or securities." *Rauscher*, 2002-NMSC-013, ¶ 1 (alteration, omission, internal quotation marks, and citation omitted). In relevant part, the taxpayer argued that our Supreme Court should apply the predominant ingredient test to the matter, *id.* ¶ 36, and because the majority of the taxpayer's receipts were from the sale of securities and only 5 percent were for dealer concessions—the difference between the dealer's purchase price and the sale price—the transaction did not involve a sale of a service and therefore was subject to the deduction for a sale of securities. *Id.* ¶ 37.

**{20}** Our Supreme Court recognized that the hearing officer appropriately characterized the taxpayer as having received a commission. *Id.* ¶ 39. It noted that if it were to agree with the taxpayer, the statute requiring commissions be taxed would become a nullity because all brokered transactions that give rise to a commission would involve a sale of goods valued more than the commission earned. *Id.* Thus, the tax on a commission would never apply. *Id.* Here, the value of tangible chemicals in excess of eighteen-ton lots would almost always exceed the value of any service-related component, such that the gross receipts tax would never apply. To construe the deduction such that all transactions at issue cannot be taxed would go against the presumption that all receipts are taxable, and ignore our obligation to construe a statutory exception to a tax strictly in favor of the taxing authority. *See* § 7-9-5(A); *Chavez*, 1970-NMCA-116, ¶ 7.

**{21}** We also note that the Legislature further demonstrated its intent regarding this deduction by amending Section 7-9-65, effective July 1, 2019. The amendment limited the deduction applicable to receipts from selling chemicals and reagents in excess of eighteen-ton lots "to any hard-rock mining or milling company for use in any combination of extracting, leaching, milling, smelting, refining or processing ore at a mine site[.]" *Id.* This clarification highlights that the Legislature did not intend to apply the statute's deduction to chemicals used in fracking. While not dispositive as to transactions that occurred before this amendment, the recent change clarifies current legislative intent in a manner that supports our analysis and conclusion herein. *See Tucson Elec. Power Co. v. N.M. Tax'n & Revenue Dep't*, 2020-NMCA-011, ¶ 15, 456 P.3d 1085 (referencing the 2019 amendment to Section 7-9-65 to illustrate the legislative intent to not apply the deduction for a sale of coal in excess of eighteen tons).

**{22}** Although Taxpayer separates out the sale of the chemicals it uses for fracking in its receipts, Taxpayer's invoices are insufficient to turn the chemicals used in the fracking process into a standalone sale. Taxpayer uses its branded fluid systems to create cracks in rock so oil and gas can flow out of the ground. Taxpayer controls the materials it uses in fracking, and its customer never takes possession of the materials for its own use. The customer takes no care, custody, or control over the materials at any point. Once the materials are pumped into the well, they lose their identity and have no value to the customer; they are either lost in the formation or disposed of as waste.

This further indicates the chemicals at issue are used in the process of fracking and are not a standalone sale of chemicals. Based on the foregoing, we conclude that Taxpayer failed to meet its burden to overcome the presumptions, *see Pub. Serv. Co. of N.M.*, 2007-NMCA-050, ¶ 32, and because the right to claim a deduction for receipts from the sale of fracking is not clearly and unambiguously expressed in Section 7-9-65, we conclude it is inapplicable to receipts from the sale of chemicals used here for fracking. Therefore, Taxpayer is not entitled to a deduction under Section 7-9-65. Based on our conclusion, we need not address Taxpayer's argument that the AHO's interpretation of the word "lots" per Section 7-9-65 was legal error.

**Proppant Is Not a Chemical Under Section 7-9-65**

{23}    In order to address the next issue, whether proppant is a chemical pursuant to Section 7-9-65, it is necessary to provide further details about the fracking process. Fracking is performed in stages. Each stage refers to a section of the well into which fluids are pumped. A number of steps go into each stage of the well during the process, none of which are important to our analysis. Suffice it to say that the CRC proppant for which Taxpayer seeks a deduction as a chemical is usually only used in the final step. At that point, CRC proppant is pumped in and is used to hold open fractures. It is comprised of silica coated with resin and a curing agent. When the CRC proppant is placed in the well, an outside action, like the heat of the well, produces a reaction that causes the resin to harden, linking the proppant together so it stays in the cracks. The final step includes performing a flush, which clears the excess material and makes sure the proppant is placed in the fractures and not left in the pipes.

{24}    Taxpayer argues that CRC proppant qualifies as a chemical under the deduction. *See* § 7-9-65. "Chemical" as used in Section 7-9-65 is defined by our regulations as "a substance used for producing a chemical reaction." 3.2.223.7(B) NMAC. Taxpayer contends the AHO's conclusion that CRC proppant is not a chemical "is inconsistent with the plain language of both Section 7-9-65 and 3.2.223.7(B) NMAC." Before discussing 3.2.223.7(B) NMAC, we turn to Section 7-9-65.

{25}    We must start by determining whether CRC proppant falls under "chemicals" in Section 7-9-65. Because the word "chemicals" in Section 7-9-65 is ambiguous, we look to whether the Legislature intended to create a separate deduction for receipts from the sale of CRC proppant. *See Tucson Elec. Power Co.*, 2020-NMCA-011, ¶ 12 (concluding that the word "chemical" in Section 7-9-65 is ambiguous and, therefore, in determining whether natural gas was a chemical under the statute, looking to whether the Legislature intended to create a separate deduction for receipts from the sale of natural gas).

{26}    In *Tucson Electric*, this Court "determine[d] Section 7-9-65 to be ambiguous as to its applicability to natural gas and emphasize[d] that both Section 7-9-65 and its corresponding regulations fail to mention the words 'natural gas' or 'fuels.' " *Tucson Electric Power Co.*, 2020-NMCA-011, ¶ 12. Similarly, here, neither Section 7-9-65, its corresponding regulations, nor any other provision of the Act mentions proppant,

hardened silica, treated sand, or other similar compounds, nor does it mention hydraulic fracturing or fracking. We therefore conclude Section 7-9-65 is ambiguous as to its applicability to CRC proppant.

**{27}** Having so determined, we next consider whether CRC proppant is a "chemical" as defined in Section 7-9-65's corresponding regulation, 3.2.223.7(B) NMAC. *See* NMSA 1978, § 9-11-6.2(G) (2015) (stating that regulations issued by the secretary of the Department are presumed to be a proper implementation of the statute). Taxpayer argues the AHO's conclusion that CRC proppant is not a chemical is inconsistent with the plain language of 3.2.223.7(B) NMAC, which defines "chemical" as "a substance used for producing a chemical reaction."

**{28}** Because Taxpayer claims the AHO committed legal error in concluding CRC proppant is not a chemical under 3.2.223.7(B) NMAC and because Taxpayer has not challenged the factual findings related to this issue, we accept that the AHO's findings of fact are supported by substantial evidence. *See* Rule 12-318(A)(3) NMRA. In relevant part, the AHO found (1) CRC proppant is used to hold open fractures; (2) "CRC proppant is made up of three substances: silica, resin, and the curing agent[;]" (3) "[t]he silica does not participate in any reaction[;] and (4) "[t]he resin and the curing agent require some outside action before they react[, and i]t is either the heat of the well or an activator that produces any reaction." Because these findings of fact involve specialized technical or scientific knowledge, we give them great deference. *See Pickett Ranch, LLC v. Curry*, 2006-NMCA-082, ¶ 49, 140 N.M. 49, 139 P.3d 209 ("Particularly where specialized technical or scientific knowledge is involved, we will give great deference to an agency's factual findings."). Applying these unchallenged findings of fact to the definition in 3.2.223.7(B) NMAC, we conclude CRC proppant is not a chemical.

**{29}** "The canons of statutory construction guide our interpretation of administrative regulations." *Albuquerque Bernalillo Cnty. Water Util. Auth. v. N.M. Pub. Regul. Comm'n*, 2010-NMSC-013, ¶ 51, 148 N.M. 21, 229 P.3d 494. We therefore "look first to the plain language of the [regulation], giving the words their ordinary meaning[.] *Id.* ¶ 52. The corresponding regulation, 3.2.223.7(B) NMAC, defines chemical as "a substance used for *producing* a chemical reaction." (Emphasis added.) "Produce," in relevant part, means "to cause to have existence or to happen [or] bring about." *Produce*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/produce (last visited Feb. 14, 2022). Here, we conclude CRC proppant is not a substance "used for producing"—that is, causing or bringing about—a chemical reaction, because, as the AHO found, (1) CRC proppant is used to hold open fractures; and (2) the resin and curing agent require some outside action before they react, and it is either the heat of the well or an activator which produces the reaction of the resin and curing agent. In other words, although the resin and curing agent participate in a reaction, they do not produce the reaction. Instead, the heat or an activator produces the reaction, which allows the CRC proppant to accomplish its purpose of holding open fractures.

**{30}** Taxpayer makes several arguments implicating these two findings of fact. Concerning the AHO's finding as to the purpose of CRC proppant, Taxpayer

acknowledges that *one* purpose of CRC proppant is to hold open fractures but argues that another purpose is to produce a chemical reaction, which results in a stronger proppant. Otherwise, Taxpayer contends, "there would never be a need for CRC proppant instead of regular proppant." In other words, Taxpayer claims that CRC proppant produces a chemical reaction to accomplish the purpose of "creating a proppant that is better able to prop open fractures." In urging us to find that CRC proppant has another purpose, Taxpayer asks this Court to make factual findings not present in the AHO's decision. Here, the finding regarding the purpose of CRC proppant is supported by substantial evidence, and we decline to disturb it. *See Montano v. N.M. Real Estate Appraiser's Bd.*, 2009-NMCA-009, ¶ 8, 145 N.M. 494, 200 P.3d 544 ("We will not disturb the agency's factual findings [that are] supported by substantial evidence[.]"). This is particularly true in this case where specialized technical or scientific knowledge is involved. *See Pickett Ranch*, 2006-NMCA-082, ¶ 49.

{31}     Taxpayer next puts forth two arguments that relate to the AHO's finding of fact that the resin and the curing agent require an outside action before they react, and that either the heat of the well or an activator produces this reaction. First, Taxpayer argues the fact that a substance requires heat—or an activator which merely reduces the amount of heat required to induce a reaction—"cannot disqualify the *resin and curing agent* from being chemicals." (Emphasis added.) The issue before the AHO—and now before this Court—was whether CRC proppant is a chemical, not whether the resin and curing agent are chemicals. Second, Taxpayer contends that a certain amount of heat is required for all chemical reactions, and "if the need for an initial input of energy to induce a reaction disqualified a substance from being a chemical, there could never be any chemicals." Such an interpretation, however, would lead to broader application of the deduction, contrary to our directive to construe the deduction narrowly against Taxpayer. Most importantly, these arguments would lead us to discount an agency's unchallenged factual finding involving specialized scientific knowledge, to which we give great deference—namely, that the reaction of the resin and curing agent is produced by an outside action, either the heat or an activator. *See id.*

{32}     Taxpayer next contends the AHO's conclusion that CRC proppant is not a chemical is inconsistent with the regulation's plain language. Taxpayer contends "the regulation's use of the phrase '*used for* producing' means that a chemical need merely play some role in producing the reaction." But as the Department points out, Taxpayer cites no authority for this construction. We therefore decline to address this argument. *See Curry v. Great Nw. Ins. Co.*, 2014-NMCA-031, ¶ 28, 320 P.3d 482 ("Where a party cites no authority to support an argument, we may assume no such authority exists."). Moreover, such an interpretation would, again, run contrary to our directive to construe deductions narrowly against Taxpayer.

{33}     Finally, Taxpayer argues the AHO's interpretation of 3.2.223.7(B) NMAC is inconsistent with the plain language of Section 7-9-65. Taxpayer contends the AHO's interpretation renders Section 7-9-65's use of "chemicals or reagents" meaningless because the only substances that would qualify as "chemicals" would be "reagents." "In interpreting a statute, we must avoid if possible a construction that renders part of the

statute surplusage." *Cal. First Bank v. State*, 1990-NMSC-106, ¶ 31 n.5, 111 N.M. 64, 801 P.2d 646. We disagree with Taxpayer's argument on this point.

**{34}** Section 7-9-65 applies to "chemicals or reagents[.]" In concluding CRC proppant is not a chemical, the AHO applied the definition of chemical in 3.2.223.7(B) NMAC: "a substance used for producing a chemical reaction." As to "reagents," which neither the statute nor its corresponding regulations define, the parties proffer the same definition: "a *test substance* that is added to a system in order to bring about a reaction or to see whether a reaction occurs (e.g. an analytical reagent)." *Reactant*, IUPAC Compendium of Chemical Terminology, https://goldbook.iupac.org/terms/view/R05190 (last visited Feb. 14, 2022) (emphasis added).

**{35}** Based on these definitions, we cannot say there is no distinction between "chemicals or reagents" as used in Section 7-9-65, or that the AHO's interpretation of the regulatory definition of chemical renders the word "chemicals" in Section 7-9-65 meaningless. Assuming without deciding that reagent is defined as above, a reagent is apparently limited by its purpose—i.e., it serves as a test substance. A chemical, by contrast, apparently need not be limited to use as a test substance. *See* 3.2.223.7(B) NMAC. Thus, defining "chemical" as we do does not render the term "reagent" in the deduction meaningless.

**{36}** In sum, we conclude Section 7-9-65 is ambiguous as to its applicability to CRC proppant, and our analysis of 3.2.223.7(B) NMAC as applied to the AHO's unchallenged factual findings does not indicate otherwise. Strictly construing the statute in favor of the Department, we conclude Taxpayer has not clearly established the right to the deduction. *See Tucson Elec. Power Co.*, 2020-NMCA-011, ¶ 11. ("[B]ecause [the t]axpayer is claiming a tax deduction under Section 7-9-65, we must strictly construe the statute in favor of the Department and the right to the exemption or deduction must be clearly and unambiguously expressed in the statute, and the right must be clearly established by the taxpayer." (internal quotation marks and citation omitted)).

**CONCLUSION**

**{37}** For the foregoing reasons, we affirm the AHO's denial of Taxpayer's protest.

**{38} IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**GERALD E. BACA, Judge**